(C. D. 2009)

EBELING & REUSS CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 20, 1958)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*Murray Sklaroff,* trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

OLIVER, Chief Judge: This protest has been limited to certain items that were classified under the general provision in paragraph 218 (f) of the Tariff Act of 1930, as amended, for—

\* \* \* all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sand-blasted, silvered, stained, or decorated or

ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free * * *

and assessed with duty at different rates applicable to particular subdivisions of the foregoing general provision in paragraph 218 (f), as amended. Item LG–188, described on the invoices as "Decanters," and items LS–609, LS–612, and LS–601 to LS–606, inclusive, described on the invoices as "Vases," were assessed with duty at the rate of 22½ per centum ad valorem under paragraph 218 (f), as modified by T. D. 52739, supplemented by T. D. 52763, as glass articles, cut or engraved, and valued at $3 or more each. Items LG–180 and LG–236, described on the invoices as "Vases," were assessed with duty at the rate of 15 per centum ad valorem under paragraph 218 (f), as modified by T. D. 52373, supplemented by T. D. 52462, as glass articles primarily designed for ornamental purposes, decorated chiefly by engraving, and valued at not less than $8 each. Item LU–2010, described on the invoices as "Vases," was assessed with duty at the rate of 30 per centum ad valorem under the residuary provision for "Other" glass articles in paragraph 218 (f) of the Tariff Act of 1930, as modified by T. D. 51802.

Plaintiff claims that all of the items are properly classifiable under the provision in paragraph 1547 (a) of the Tariff Act of 1930, as modified by T. D. 52373, supplemented by T. D. 52476, reading as follows:

Works of art, not specially provided for:
  Statuary, sculptures, or copies, replicas, or reproductions thereof,
  valued at not less than $2.50_____ 10% ad val.

An alternative claim is made with respect to items LG–180, LG–188, and LG–236, plaintiff alleging that the articles represented by those three items are engravings, and, therefore, are properly classifiable under the provision in paragraph 1547 (a), as modified by T. D. 51802, for "Works of art, not specially provided for: * * * Etchings and engravings," carrying a dutiable rate of 10 per centum ad valorem.

Three witnesses appeared herein; all testified on behalf of plaintiff. Plaintiff's executive vice president, who is director of sales, identified each of the items in controversy. A pictorial representation of each was received in evidence (plaintiff's collective illustrative exhibit 1).

Plaintiff's second witness, concededly an artist, testified that he created all of the items under consideration; that he has worked in glass as a medium of expression in art since 1928; and that he uses glass for its beauty to produce sculptures. He stated that glass is an optical material, possessing purity, transparency, and brilliancy, which make it particularly attractive as an art medium. He testified, further, that the articles in question are not designed for utilitarian purposes, but rather as expressions of beauty through the medium

of glass. Explaining the method that was followed in producing each of these articles, the witness stated that his original idea was shown in a sketch which he took to the glassblower. He explained to the glassblower how the article was to be made, and then supervised the glassblower in his work, emphasizing what was to be done, and correcting any mistakes that might be made.

The witness' testimony, outlining how the articles in question were produced, is substantially as follows: The material, i. e., glass, is blown without form and in such a manner as to make a vacuum, or a hole, that enables the artist to get a 3-dimensional effect showing the stereoscopic picture. Otherwise, it would be a solid, heavy, massive piece, and not the beautiful sculpture that is intended by the artist. All coloring in the various objects was done by the glassblower, using a colored glass rod. Following the glassblowing operations, the articles were subjected to a cutting process by means of revolving grinding and emery wheels that are pressed against the glass. Thereafter, the articles were polished with the use of cork and pumice. Some of these items are engraved. Where such embellishment was applied, the artist prepared a sketch of the design that is brought on the glass. The relief was obtained with the use of small copper wheels saturated with emery and oil. The artist, personally, supervised the engraving process that was done by individuals who were students taught by the witness in the technique of using glass as an art medium. These workmen, by virtue of their training and experience, are recognized as artists. The writer of this opinion examined all of the items in question when they were in court at the time of the first hearing of this case in Philadelphia. From his personal observation of them, it can be said that their general appearance supports the witness' testimony to the effect that these articles are highly decorative and purely ornamental and that the use of flowers and water in them would detract from their beauty reflected by their transparency and brilliance.

Plaintiff's third witness was the director of the Philadelphia Museum of Art. Government counsel conceded the witness' qualifications "to speak on works of art questions." The witness stated that he knew, by reputation, Dr. Lindstrand, the creator of the articles under consideration, as "one of the important artists working in this medium, which is a medium that in modern times has been developed to great perfection in Sweden, very specially in Sweden, and in this particular type of very heavy, blown, etched, and engraved glass." He defined a work of art as "a creation or an invention made by an artist to satisfy his sense of beauty and form to give esthetic pleasure to others." Referring particularly to "the seated figure titled 'Vanity' " (item LG–180) and "the figure of a

bird" (item LG–188), and the scene in the woods (item LU–2010), the witness identified them as types of glass statuary or sculptures. He testified, further, that all of the items under consideration show a very high degree of skill that required "many choices and decisions to be made in the course of their development. They involve the creative process throughout."

On cross-examination, the witness testified that anything produced by an artist renders the article a work of art. In this connection, he stated that they may not be "great works of art, but in my opinion they are works of art. They are fashioned and created; they are inventions of an artist's mind not found in nature." Questioned concerning the form or the shape of the articles under discussion, the witness testified as follows:

X Q. But here I see they all have a certain cylindrical shape as if they were designed to hold something. And isn't the artist restricted in his creation to such a device?—A. You mean it should hold something?

X Q. He works with the concept of having it hold something and then proceeds to create from there, isn't that so?—A. I think that that's incidental. I think these objects are blown objects coming out of the pipe and they necessarily assume that cylindrical form. And then they are moulded and shaped by the artists [sic] hands. These, by the very nature, are so heavy in weight that they to my way of thinking are designed purely as decorative objects and as objects of beauty, decorations.

Paragraph 1547 (a) of the Tariff Act of 1930 reads as follows:

Works of art, including (1) paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same, (2) statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50, and (3) etchings and engravings, all the foregoing, not specially provided for, 20 per centum ad valorem.

In approaching our discussion of the present issue, it must be borne in mind that the provision for "Works of art," as it appears in paragraph 1547 (a), as originally enacted and as amended, is not limited by the statutory language that follows. In other words, merchandise may be classifiable as "Works of art" under paragraph 1547 (a), as amended, without being one of the things named thereafter. *Petry Co.* v. *United States*, 11 Ct. Cust. Appls. 525, T. D. 39666; *United States* v. *John Wanamaker*, 19 C. C. P. A. (Customs) 229, T. D. 45336; *F. Lunning, Inc., et al.* v. *United States*, 39 Cust. Ct. 271, C. D. 1941.

Counsel for plaintiff, in his brief, states that "Plaintiff *relies heavily* upon the decision in the case of *Wm. S. Pitcairn Corp.* v. *United States*, 39 C. C. P. A. (Customs) 15, C. A. D. 458, which in effect modifies all prior decisions made by the customs courts about the interpretation to be given to paragraph 1547 (a) and its predecessors." [Italics quoted.] In the cited case, the merchandise consisted of

certain Doulton figurines that were classified as earthenware or china or porcelainware and which were claimed to be works of art under the same provision in paragraph 1547 (a), *as amended,* invoked herein by plaintiff under its principal claim.

Summarizing the creation and the composition of the figurines involved therein, the court, in the *Wm. S. Pitcairn Corp.* case, stated as follows:

From the facts recited it appears that a sculptor makes a clay or wax model of the particular figurine which it is desired to produce and from it a mold is fashioned. Because of the form of the model, the mold must be in segregated parts, and in each separate part the appropriate portion of what ultimately is to be the figurine is cast or molded. The separate portions are then removed from the mold, joined together, properly trimmed, given a finishing surface treatment, and finally painted or decorated by hand.

    *     *     *     *     *     *     *

The sculptor Harradine stated that he had nothing to do with the process of molding and casting, but that when he sent a model to Doulton & Co., Ltd., to be used in the making of molds, he accompanied it with suggestions as to colorings, not, however, himself painting the model.

With the sculptor Daws, who made the dog models, which are of china, or porcelain, the situation appears to be somewhat different in that, while he had nothing to do with the preparation of the molds, they being made by a molder whom he employed, nor with the casting of the original figurines, he did remove the seams from the casts made from the sections of the moldings, finally "touched the figurines up generally," and also he delivered to Doulton one extra model in full color as it was to appear when produced in china. He did the painting on the extra model, which he refers to as the master model, himself, but did not paint any copies, reproductions, or replicas of the original.

Another fact important to be borne in mind is that the molds deteriorate with use and in order to maintain the exact similarity of the figurines, when it is desired to have a large number of reproductions, new molds must be fashioned. This is done by utilizing the original model made by the sculptor. So far as we have found, there is no evidence as to how often new molds are required. Of course, the producers may make several molds at approximately the same time and have them ready for use when needed.

Referring to the scope of the provision in paragraph 1547 (a), as amended, for—

Works of art, not specially provided for: Statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50 * * *

the appellate court, in the cited case, made the following comment:

However, it should be noted that in the 1930 Act Congress inserted "valued at not less than $2.50," a limitation which had not been present in the respective acts of 1913 and 1922. That new matter and the higher rate constitute the only changes from the 1913 tariff law. It seems not inappropriate to suggest at this point that the Congress which passed the 1930 Act evidently felt that *there are, at least for tariff purposes, works of art,* including statuary and sculptures, *which are of low value so far as dollars and cents are concerned.* [Italics supplied.]

Applying the foregoing statutory construction to the classification of the Doulton figurines involved in the *Wm. S. Pitcairn Corp.* case, the appellate court stressed the use of the statutory term "sculpture" for tariff purposes and adopted the meaning as it was enunciated in *United States* v. *Downing & Co.*, 6 Ct. Cust. Appls. 545, T. D. 36197, wherein the court stated:

* * * In the common acceptation of the term [sculpture], a work to be entitled to the characterization of sculpture must be the production of a professional sculptor. It must be a work that embodies professional skill, taste, touch, and artistic conception, appealing not only to the eye but the emotions as well, and although "sculptures" may include under the statute copies of recognized works of that art, yet such copies must possess the same qualities or characteristics, and, whether an original or a copy, must be made either by or under the supervision of a professional sculptor. It is unbelievable that a sculpture in the common understanding can be produced by one who has neither embraced that profession nor has artistic skill, taste, touch, or ability in exercising it.

Following its acceptance of the foregoing judicial interpretation, and upon a finding that the figurines had a genuine beauty, that none of them was created for utility, and that they were intended to be and are articles of common commerce, our appellate court, concluding that the articles were classifiable as works of art, stated as follows:

We fully realize that not everything modeled by a sculptor thereby becomes a sculpture, or a work of art, within the common meaning of the terms, which, in the absence of defining phraseology, is also the statutory meaning, and we have given careful study to the arguments of counsel for the Government, in the light of the numerous decisions which they cite, against holding the originals in this case to have been sculptures, but we are not convinced of the soundness of their position.

The fact that suggestions as to subject matter to be represented by the figurines were made at times to the sculptors by the art director of Doulton & Co., Ltd., does not, in our opinion, detract from the originality of the sculptor's work.

For example, the witness Daws evidently was familiar with many types of dogs, and if the art director ordered the figure of, say, a Cocker Spaniel in a certain position he modeled one from his own knowledge and observation of the breed and its motions and appearance, or perhaps from life. On the same basis, the witness Harradine in forming his diminutive figures of persons, we think, did original work even when he was carrying out general suggestions made to him.

We have not commented upon the work of those who painted the articles because the primary interest here revolves about the sculpture. The evidence is clear, however, that a high order of skill is displayed in the decoration of the figurines.

We have studied the evidence of the expert witnesses called on behalf of the Government whose testimony was to the effect that the involved figurines are not works of art. We think it evident that they approached the subject as artists—we do not question their ability as such—rather than from the standpoint of congressional intent in the matter of levying tariff duties.

The Congress did not create the new law embraced in paragraph 376 of the 1913 tariff act idly, nor has it been retained idly. The amendment as to valua-

tion adopted by the Congress which passed the 1930 Act is believed to have a significance which aids in interpreting the paragraph. That phraseology has not been considered by us previously.

The Congress obviously intended that some forms of statuary and sculpture and copies, replicas, or reproductions of same should be classifiable under paragraph 1547 (a), *supra*. If figurines, such as those here involved, are held not to be so classifiable, it seems to us the paragraph will be greatly mutilated even if not wholly emasculated.

No identification of originals as distinguished from copies is made among the figurines here involved, nor in the protest. So, upon the record, all should pay duty at the rate of 20 per centum ad valorem.

Consistent with the reasoning and the statutory construction invoked in the *Wm. S. Pitcairn Corp.* case, *supra*, and upon the basis of the record before us, it is our opinion that the articles under consideration are properly classifiable under paragraph 1547 (a), as amended, as alleged by plaintiff. In this case, all of the evidence was introduced by plaintiff. Highly qualified witnesses testified. Their uncontradicted testimony is persuasive to the effect that the objects in question are original creations of a sculptor. That details involved in the production of these various articles were done under the supervision of, and not personally by, the sculptor or artist, is no bar for classification of the merchandise under said amended paragraph 1547 (a), within the pronouncements of the *Wm. S. Pitcairn Corp.* case. All of these objects are the result of artistic skill and the ability of artists to work with glass as an art medium.

The articles, themselves, lend support to our conclusion. From the writer's personal observation of them, they appear to be within the class of modern suggestive art. Our views with respect thereto are adequately expressed in the dissenting opinion in *United States* v. *Mrs. Adelaide Ehrich*, 22 C. C. P. A. (Customs) 1, T. D. 47019, wherein the late Judge Bland stated as follows:

* * * It is a matter of common knowledge that the greatest present-day interest in art and the greatest commercial activity in connection with art involves modern art which includes impressionism and post-impressionism. See "post-impressionism", Webster's New International Dictionary (1932) under "new words." Also see Henry R. Poole's "Modern Art, etc.," which is a criticism of modern art tendencies, and Sheldon Cheney's "Primer of Modern Art" which defends present day tendencies.

Modern suggestive art does not portray things in their natural form, but merely portrays objects in such form, sometimes distorted or incomplete, as will be suggestive of the idea which is to be conveyed. Modern classical music now encourages the occasional intentional use of discords. These innovations by modern artists seem to be in harmony with the tendency of the times, and it is the kind of art which possesses such elements of eccentricity that holds the stage today. It has its friends and its enemies, but the enemies of suggestive sculpture and painting *all agree that it is art, has artistic merit, when done by a good artist,* but contend that it is not as good from an artistic standpoint as realistic art. [Italics supplied.]

Reference is appropriate to the early decision of this court in *Brancusi* v. *United States*, 54 Treas. Dec. 428, T. D. 43063. That case involved an article titled, "Bird in Flight," by Brancusi. Although the court recognized that the object did not measure up to the recognized standard definition of "sculpture," the article was held to be free of duty as sculpture. In reaching the conclusion, the court gave consideration to the tendencies of modern art.

The articles under consideration are creations of a sculptor, conceded by defendant to be an artist, recognized for his work in glass as an art medium of modern times. They portray objects, sometimes distorted, sometimes incomplete, but always suggestive of ideas and things. They are sculptures of modern art.

The decision of our appellate court in *United States* v. *Mrs. Adelaide Ehrich*, 22 C. C. P. A. (Customs) 1, T. D. 47019, the only case cited in defendant's brief, cannot be applied herein. In that case, two shipments were involved; one under the Tariff Act of 1930 and the other under the Tariff Act of 1922. Although the merchandise consisted of glass articles that were claimed to be classifiable as works of art, the discussion, in that case, followed early cases that construed provisions of tariff acts prior to the Tariff Act of 1930. The *Adelaide Ehrich* case, as well as the cases cited therein, followed reasoning different from that employed in the *Pitcairn* case, *supra*, which we regard as controlling herein. The effect of the *Pitcairn* case was to overrule earlier cases, including the *Adelaide Ehrich* case and those cited therein, which limited the provision for works of art, in paragraph 1547 and its predecessors, to works of the free fine arts. Under the *Pitcairn* case, the provisions of paragraph 1547, as originally enacted and as amended, have been extended to include articles of common commerce, possessing beauty and not created for utility, such as the objects involved herein.

For all of the reasons hereinabove set forth, we hold the merchandise represented by the items identified on the invoices as LG–188, LG–236, LS–609, LS–612, LU–2010, LG–180, and LS–601 to LS–606, inclusive, to be properly classifiable under paragraph 1547 (a), as amended, *supra*, and dutiable thereunder at the rate of 10 per centum ad valorem, as claimed by plaintiff. The protest, having been abandoned so far as it relates to the invoice items LH–1216, LH–1189, and BW–304, is dismissed as to those three items. In all other respects and as to all other merchandise, the protest is overruled. Judgment will be rendered accordingly.