(C.D. 2628)

HARTMAN TRADING CORP. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 16, 1966)

*Siegel, Mandell & Davidson* (*David Serko* and *Richard H. Abbey* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

---

DONLON, Judge: A number of articles, imported by plaintiff from the Orient, were classified by the collector as articles or wares, or manufactures, and charged with duty at the several rates provided according to the component material of chief value of each article.

The protests claim classification, alternatively, under paragraph 1807 as original works of art, free of duty, and under paragraph 1547(a), as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade (T.D. 52373), at 10 percent ad valorem.

While the protests fail to specify the particular classification claimed by plaintiff under modified paragraph 1547(a), no objection was raised on this score and the deficiency has been corrected, both on trial and in plaintiff's brief. The protest claim under paragraph 1807 has been abandoned. The claim that is litigated is specified as a claim for classification of these articles, under modified paragraph 1547(a), as "Works of art, not specially provided for: Statuary sculptures, or copies, replicas or reproductions thereof, valued at not less than $2.50 * * *." (Plaintiff brief, p. 2.)

While the tariff provision under which plaintiff claims is thus made certain and definite, there is an error in plaintiff's statement of the issues. The first issue (as correctly stated) is whether plaintiff's proofs adequately establish that these articles are statuary or sculptures which are works of art *per se*. The second issue is incorrectly stated to be whether these articles have been shown, by the proofs, to be copies, replicas, or reproductions of *works of art*, in the context of that expression in paragraph 1547. No such provision for copies, replicas, or reproductions of *works of art* is found in paragraph 1547, either as Congress enacted it or as modified. There is a classification for copies, replicas, or reproductions of statuary or sculptures which are works of art.

Nine protests are consolidated for purposes of trial. The entries of these protests include a considerable number of different articles, imported between April 17, 1961, and November 14, 1961.

There are in evidence 55 exhibits, which include some articles that are identified as samples of some of the items of the imported merchandise, some articles said to be representative of other items, and some photographs that are said to be illustrative of still other articles of the merchandise.

The official papers were not offered in evidence. Proofs consist of exhibits and oral testimony.

Mr. Marvin Sokolow, import manager and salesman for plaintiff, identified the 55 exhibits, relating them to a particular item or items on the entry invoices, to which he referred in his testimony. He said

that he was familiar with the entries, in his official capacity as plaintiff's import manager.

The following actual or representative samples were described by Mr. Sokolow:

| Exhibit | | Item No. or Nos | Entry No. |
|---|---|---|---|
| **3 | Black bronze calf | 105–33 | 1018831 |
| | | 105–33B | 836245 |
| **5 | Dog and sandal | 87–10 | 1018831 |
| **6 | Cooper | 82–8 | 1018831 |
| *8 | Kwan Yin head | 285 | 1018831 |
| **8 | Kwan Yin head | 284, 294, 83–19 | 1018831 |
| | | 329, 88–36 | 836245 |
| *9 | Carving of horse | 287 | 1018831 |
| **9 | Other figures | 286, 288 | 1018831 |
| ***16 | Chinese beauties | 4781, 4789, 4790, 4850, 4853, 4854, 4855, 4841, 4679, 4682, 4685, 4857AB, 4672, 4673 | 1010169 |
| **16 | Chinese beauties | 4915, 4565, 4566, 4567, 4870 | 1010169 |
| ***16 | Boats | 4860, 4861, 4862, 4866, 4863, 4912 | 1010169 |
| *17 | Laughing Buddha | 4712 | 1010169 |
| **17 | Laughing Buddha | 4706, 4711, 4714, 4884, 4845 | 1010169 |
| *19 | (A & B) Pair, semi-precious stone horses | 4572–AB | 1010169 |
| **19 | (A & B) Pair, semi-precious stone horses | 4867–AB, 4868–AB, 4554–AB, 4570–AB, 4573–AB, 4574–AB, 4575–AB | 1010169 |
| *23 | Elephant | 4894 | 1010169 |
| **23 | Elephant | 4722, 4833, 4884, 4886, 4888, 4889 | 1010169 |
| **27 | Incense burner | Ivory carving+ | 1002483 |
| **28 | Ivory carving | King, sitting+ | 1002483 |
| **29 | Ivory carving | Queen, sitting+ | 1002483 |
| | | Sitting empress+ | 749185 |
| **30 | Ivory carving | Beauty, with flowers+ | 1002483 |
| **30 | Ivory carving | Ditto+ | 749185 |
| **31 | Ivory carving | Tea bottle+ | 1002483 |
| **32 | Ivory carving | Tea cup+ | 1002483 |
| **39 | Jyuro, old man | 82–42 | 521889 |
| **40 | Horse | 82–47 | 521889 |

| | Exhibit | Item No. or Nos | Entry No. |
|---|---|---|---|
| **41 | Figure | 82–43 | 521889 |
| **42 | Ghost | 82–45 | 521889 |
| ***45 | Jade heroine | F397; F396; F505 | 708722 |
| **45 | Ivory carving | Standing heroine+ | 749185 |
| ***46 | Knight | Knights+ | 708722 |
| **46 | Ivory carving | Standing hero+ | 749185 |
| **47 | | Wei-Tao Buddha+ | 708722 |
| **51 | Bronze figure | 12–31 | 836245 |
| *55 | Coral boar | 83–35 | 836245 |

*Exhibit and item No. are from the actual shipment.
**Representative, but from another shipment.
***Representative, but with variations.
+Record does not identify by invoice item number.

The photographic exhibits were related by Mr. Sokolow to invoice items, which the photographs are said to illustrate, as follows:

| | Exhibit | Item No. or Nos. | Entry No. |
|---|---|---|---|
| 1 | Green bronze mask | 105–25, 105–26 | 1018831 |
| 2 | Green bronze rhinoceros | 105–24 | 1018831 |
| 4 | Bronze square vase | 69–13 | 1018831 |
| 7 | Pair, rose quartz carved bird, on tree | 291, 292, 293 | 1018831 |
| 10 | Pair, serpentine carving of Foo dogs | 302 | 1018831 |
| 11 | Bronze seated figure | 12–29 | 1018831 |
| 12 | Bronze Siamese head | M–4016, M–4001 | 1018831 |
| 13 | Bronze head | 35–10 | 1018831 |
| 14 | Bronze sitting figure | 3–111 | 1018831 |
| 15 | Bronze sitting figure | 12–136 | 1018831 |
| 18 | 3 Buddhas | 4250, 4252, 4245, 4247, 4249, 4392, 4242, 4243 | 1010169 |
| 20 | Pair, pigeons | 4799AB, 4801AB, 4802AB | 1010169 |
| 21 | Pair, birds | 4525AB, 4527AB, 4795AB, 4796AB, 4869AB | 1010169 |
| 22 | Pair, Foo lions | 4876AB, 4878AB | 1010169 |
| 24 | 3 cats | 4899 | 1010169 |
| 25 | 5 rose quartz rabbits | 4901 | 1010169 |

| 26 | Incense burner | 4568, 4569 | 1010169 |
|---|---|---|---|
| 33 | Ivory carving, pagoda | Not identified as to item number | 1002483 |
| 34 | Coral carving, 7 happy gods | 83–12 | 521889 |
| 35 | Lady holding baby | 83–16 | 521889 |
| 36 | Coral carving, lady and Hotei, with child | 83–13 | 521889 |
| 37 | Coral carving, lady | 83–14 | 521889 |
| 38 | Coral carving, lady and boy | 83–15 | 521889 |
| 43 | Ivory emperor and empress | F227, F216 | 708722 |
| 44 | Kwan-Yin, many arms | F509, F504, F510 | 708722 |
| | Ivory 18 armed Kwoon-Yun | Not identified as to item number | 749185 |
| | Goddess of mercy, 8 arms | F539 | 708722 |
| 48 | Ivory, emperor and empress | Not identified as to item number | 749185 |
| 49 | Ivory, standing general | Not identified as to item number | 749185 |
| 50 | Ivory, emperor on horse | One in pair with empress; not identified as to item number | 749185 |
| 52 | Bronze figure, with stand | 12–46 | 836245 |
| 53 | Bronze, 2 sheep | 10539, 10540B | 836245 |
| 54 | Bronze, round footed shallow bowl | 10538A | 836245 |

Mrs. Jean Johnson Young, testifying for plaintiff, described her educational training and experience as follows: Graduate of the University of North Carolina, in 1945; graduate student at New York University, Institute of Fine Arts, studying for the degree Ph. D. (not yet received, but expected soon) ; special studies at the University of Paris and at the École de Louvre, under a Fulbright scholarship for research in Far Eastern art and oriental art; study at Brussels under a Belgian-American fellowship in Far Eastern art; teacher of Far Eastern art and oriental art at Adelphi College; and, more recently, teacher at the Parsons School of Design in New York City and part-time lecturer at the Metropolitan Museum of Art in oriental and Far Eastern art. Her articles have been published in Artibus Asiai, which she described as a "ranking" publication on oriental art, and in the

Bulletin of the Amsterdam Museum. She has also written an article on Far Eastern archeology for the Encyclopedia of World Art, published by the McGraw Hill Co.

Mrs. Young gave the following as her definition of the term "work of art":

* * * there are many variations in the definition. I would say that a work of art must always be man made as distinguished from a work of nature. Let's say a beautiful sunset is a work of nature but not a work of art. So that art implies fabrication by a human being. Art as we are using it in this term is a question of visual art and not an art to be heard or smelled. Art in this context is something that we see or sometimes can handle, can feel with our fingers, but it is primarily to be seen. Art involves, according to most of the definitions, a skill or ability or an esthetic joy in the manipulation of materials of which the object is made. And, of course, the levels of skill will differ. You get some quite primitive art made by primitive people that has fine quality, but within the cultural context the artist usually enjoys a certain prestige among his fellows as being more skillful in the working of materials than the rest of the people in his immediate cultural framework. As far as the purposes and functions of the art work those vary tremendously from time to time and from place to place. They can imitate nature but they don't need to. They can be beautiful but they will not be beautiful to everyone at every period. They can evoke emotions or they can communicate ideas or they can simply give pleasure. There are many, many different jobs that the work of art does for its public . In general the work of art will comfort its public, and it will come to a satisfactory esthetic organization of the material in the shapes and forms and so forth. And again the kind of satisfaction that people take in a work of art varies considerably according to, again, a cultural context which produce or which admires the work of art. [R. 90, 91.]

In preparation for her testimony, Mrs. Young had looked at the various exhibits which are in evidence. She identified several and testified substantially as follows:

Exhibit 3 is a reproduction of a Chou Chinese bronze animal, "a copy of one in the British Museum." (R. 93.) She dated the original as about 450 or 500 B.C., and said that there is a similar piece in the Freer Gallery, in Washington, but with a "different kind of decoration on the surface." (R. 93.) In her opinion, exhibit 3 is a well executed reproduction, even to copying the variations of patina, with a good color imitation of the deep green patina on sculptures which are dug up out of the earth. (R. 92, 93.)

Exhibits 5, 6, 39, 40, 41, and 42 are copies of Japanese "netsuke." "Netsukes" were made in the 17th, 18th, and 19th century in Japan. Mrs. Young "would assume" that these exhibits are reproductions of such originals. She had seen exhibits 39 and 41 published, and would "assume there are many of them." (R. 94.) Originals were fash-

ioned with care and with great attention to detail. In her opinion, these exhibits are copies of specific pieces, and are so well executed as to mask whether they are 18th or 19th century pieces, or contemporary.

Mrs. Young explained that "since 1,000 A.D., 1,020 A.D., they [Chinese] have been copying their own ancient works. * * * sometimes it's quite hard, takes a good deal of study to figure out whether a piece is really 200 B.C. or 1,000 A.D. or 1,400 A.D. or modern." (R. 95.)

"Netsukes" were produced in considerable quantity. Many artists worked on them; and each strove to create a piece unlike any other. They have become highly competitive collector's items. They reflect religious themes, fairy tales and historical works.

Exhibit 8 is the head of a Buddhist figure, done in the style of the great classical period of Japan, the 8th and 9th centuries A.D. It is a reproduction of an original work of art, of a known type, from a Buddhist monastery in Japan. (R. 96.)

Exhibit 9 is a copy of an early Sung period jade horse, of the 10th or 11th century A.D. The original might have been done as early as the 9th century. The exhibit is a good reproduction of a Sung period horse, the original of which is considered to be a work of art. Mrs. Young was of opinion that the artist who executed exhibit 9 worked from a photograph of the horse. (R. 99.)

Exhibit 16 is a figure done in a tradition which began in Chinese art. It appears to be a Ming copy of a Sung version of the figure. The originals, both the Sung version and the Ming copy, would be considered works of art. (R. 101.)

Exhibit 17 is a Hotei, that is, god of good fortune. There are many of these, and from all periods. They range "from great works of art to household trinkets" (R. 102), which were produced to accommodate both the rich and the poor who wished to possess a Hotei. The original of exhibit 17 would be considered a work of art; in her opinion, exhibit 17 is a good reproduction. (R. 103.)

Exhibits 19–A and 19–B are Japanese dancing horses, representing 16th century Chinese and Japanese art forms, the originals of which Mrs. Young would consider works of art. She thought exhibits 19–A and 19–B well executed, but she did not know whether they were copies of a sculpture or copies of a painting. (R. 105.)

Mrs. Young described exhibit 23 as a pink quartz elephant, a modern version of an elephant based on the Indian or southeast Asia elephant, rather than on a native Chinese elephant. She did not know what elephant the artist copied. She thought exhibit 23 skillfully executed,

but not a distinguished piece. As to whether she would consider it a work of art within her definition, she testified "within the definition, its purpose, the carving, a reproduction of a native form, an art form, the elephant in art rather than the elephant in nature, *I suppose so.*" (R. 107.) [Emphasis added.]

Exhibit 27 is a carved ivory vessel in a shape which, Mrs. Young said, represented the metal incense burners of the Ming and Ching dynasties. She stated that the shape goes back to the early vessels of about 900 B.C., which were cast in bronze for use as food vessels. The shape is a traditional one, derived from the sacrificial vessels of ancient times. They were copied in jade and in porcelain in Sung times; in porcelain, metals, and various other materials in the Ming period; and in ivory and porcelain in the Ching period. She identified exhibit 27 as a copy of an 18th century original work of art, well executed and carved in the tradition that has been passed down from generation to generation.

Exhibit 28 is a Manchu figure in imperial dress, as is also exhibit 29. They are a pair, representing an emperor and empress of the Manchu dynasty which ruled China in the Ching period. The artist, Mrs. Young said, sought to reproduce the pattern of heavy brocaded clothing worn in that period. She would consider them reproductions of original pieces, although she was not familiar with the originals. (R. 110.)

Exhibit 30 is a figure of a lady. This lady with flowers is central to the Chinese art tradition from early Buddhist times, in the same way that Venus is traditional in western art. Mrs. Young testified that the carving goes back to the 17th or 18th century tradition. She stated that she did not know the original, but would consider this piece a work of art on its own merits.

Exhibit 31 is an ivory teapot, in a shape that has been developed since the Ming period. It is intricately carved, is a traditional piece, and is typical of a class. Mrs. Young said that she regards exhibit 31 as a work of art on its own merits. (R. 112.)

Exhibit 32 is a vessel carved in ivory. Mrs. Young testified that it was "probably a Ming copy of a middle Chou phase." (R. 112.)

Mrs. Young described exhibit 45 as a female figure in a warrior's costume, representing one of the heroines of Chinese literature. It is, she said, skillfully executed in a traditional art form, which she would consider a work of art.

Exhibit 46 is a figure of a warrior, representative of the later Manchu peroid. It typifies the "delight" which Chinese art takes in making fierce figures of warriors. Based on that tradition, she considered it a work of art.

Exhibit 47 is a "bodhisattva" figure with crown of jewels, a reproduction of an 18th century work of art.

Exhibit 51 is a copy of a bronze Tibetan figure, of the 17th to 18th century; a reproduction of a work of art. Mrs. Young testified that the Metropolitan Museum has a good collection of these, and she knows pieces "which could have come from the same mold" as that for exhibit 51. (R. 117.)

Exhibit 55 is a coral sculpture of a boar, described by Mrs. Young as the Far East concept of a fat, tough animal. It is illustrative of a difference in esthetic approach as between East and West. She considers it a work of art. (R. 119.)

There are in evidence a number of exhibits which are photographs. Mrs. Young said she had seen these photographs before trial. She identified certain of them as photographs of reproductions of known specific works of art and said: "All * * * are traditional * * * in one way or another." (R. 121.)

She identified photographs as follows: Exhibit 1, Chou masks; exhibit 2, a Chou bronze rhinoceros; exhibit 4, Chou sacrificial vessel; exhibit 7, pair of birds, Sung birds or Ching birds; exhibit 10, serpentine carving of Foo dogs, decorative art of the Ming dynasty; exhibit 11, 13th century Tai figure; exhibit 12, a Siamese Buddha head; exhibit 14, Japanese seated Buddha; and exhibit 18, a "three-quarter seated bodhisattva," which is a copy of the big Daibutsu Kamakura in Japan, "the type of Kamakura Buddha."

She described all of these as photographs of good reproductions of known works of art. (R. 121–124.)

Mrs. Young identified the following exhibits as photographs of reproductions of works of art, some in the tradition of certain periods: Exhibit 13, multihead Kwannon, Japanese type, Tang influence; exhibit 15, bodhisattva in royal pose, 8th century A.D.; exhibit 20, pair of birds, typical 18th century art; exhibit 21, pair of birds, imperial household art objects; exhibit 22, seated guardian dogs, Ching dynasty; exhibit 24, cats, traditional 18th century; exhibit 25, rabbits, traditional Chinese; exhibit 26, bronze vessel, typical of Sung vessel; exhibit 33, carved vessel; exhibit 34, seven happy gods of good fortune; exhibit 35, lady with child, typically traditional; exhibit 36, God Hotei, with minor goddess and two children; exhibit 37, lady with fluttering scarves holding fan, traditional Ching; exhibit 38, lady with lotus flowers and child, theme of Kwan Yin; exhibit 43, ivory carved portraits, Manchu tradition; exhibit 44, Tendai sect of Buddhism, traditional Hindu; exhibit 48, emperor and empress; exhibit 49, Chinese patriarch holding a pagoda, traditional 18th century ivory carving; exhibit 50, warrior on horseback, Manchu tradition;

exhibit 52, demoniac figure; exhibit 53, bronze vessel in shape of a ram, Chou period, 9th century B.C., and exhibit 54, bronze vessel, 950 B.C. (R. 124–128.)

Having testified that it was difficult to judge art from a photograph, and particularly difficult to judge from a photograph whether a reproduction is good, Mrs. Young explained what she meant by "difficulty in evaluating from the photograph."

* * * someone asked whether it was a good reproduction. And from the photograph it would appear that the surface of the piece was imperfect and irregular. If I had a glossy print of very good quality I would be able to tell whether the surface irregularities were intended in order to make a more archaeologically exact reproduction, because the medieval works on ancient bronzes do not come to us always with absolutely shiny, perfect surfaces. And the person making the reproduction sometimes will reproduce on purpose irregularities of patina. That's what I meant in that instance. In the case of the two little seated dog lions, from this photograph I could not tell whether, could not judge whether the copyist was working from a wood or stone original, because the reproduction is a little fuzzy as far as the shape and iconographies and subject, and so forth. And the photographs are clear enough to judge from. (R. 129, 130.)

Mrs. Young said that it was possible, in her opinion, to evaluate an article as a work of art without knowing who the artist was. Medieval art in Europe, ancient Egyptian art, sculpture in China, religious art in Africa and in Japan, for the most part was not signed. Sculpture was rarely signed. (R. 131.)

Reproductions of original works of art in the Far East were strongly influenced by a religious and political continuity that has been less broken there than in the Western World. In Japan the art forms, once established, remained, so that conceptive artists and traditional artists continued to work in one art form, even as new art forms entered the national stream. In China, art traditions were continued, except that since 1000 A.D. dealers have developed a strong archaeological interest. Copies have been continuously commissioned since the time of the Sung dynasty. Only as the 20th century opened up contact with the West, have Chinese artists been asked to practice the originality that has been insisted upon in Europe since the 16th century. R. 134.)

Mrs. Young said that the exhibits in this case are all reproductions of traditional art forms. (R. 134.) In the Far East reproductions of earlier periods are considered works of art, although minor variations show up in the copies, by way of rephrasing the subject to reflect the cultural period. Chinese would regard such reproductions as new works of art. (R. 136.) Mrs. Young characterized the exhibits as "20th century effort * * * to * * * be more accurate reproductions

than * * * [the] 18th century reproductions would have been," in the exercise of traditional workmanship to reproduce traditional form. (R. 137.)   The esthetic appeal of the exhibits is, in her opinion, sufficient for them to be considered works of art or good reproductions. Mrs. Young testified that the dominant appeal in the exhibits was esthetic, and appeal would be greater for those with a personal "interest in the east, the exotic east."   (R. 140.)

On cross-examination Mrs. Young testified that she had spent an hour and a half studying the sample exhibits, as distinguished from the photographs.   In this area, with which she is familiar, it does not take "too long" to identify an article with a particular period; but she admitted that she would have a different problem if she had to establish the authenticity of the articles as original works of art.

Exhibit 16 (figure) is a modern reproduction of an art form of very long tradition, which began in Chinese art.   (R. 142, 100.)   The tradition of copying earlier art forms or art objects is not completely unique to oriental art.   There are schools which teach oriental art. Mrs. Young mentioned the Ukiona school in Japan on "decorative objects," and the Buddhist workshops in southern China during the Sung dynasty.   She said "there would be different shop traditions in all the different art forms of different periods."   (R. 143.)   Mrs. Young testified that traditionally an artist's originality in sculpture would be tested only when something new came up, as when asked to represent visually the elements of a new religion.   This would also be true when depicting an object in nature, where two artists could come up with different representations of the same object, and these representations would be influenced by the artistic environment in which each artist lived and what he saw.

She cited the Communist revolution in China, saying that it has tried to change the technique of viewing with respect to Chinese art. (R. 146.)

She has seen the exact object from which exhibit 3 was copied or reproduced, and knows it to be an exact copy for the reason that it is the original artist's conception of an imaginary animal and it would be most unlikely that 2,300 years later another person would also have a similar idea of an imaginary animal that was not known ever to have existed.   She could not say whether exhibit 3 differed in any way from the original, since her memory of the original could not be exact, particularly as to the coloration of patina; but exhibit 3 was meant to be and is a close copy.   (R. 149.)   She did not know who executed exhibit 3, except that he must be an exceedingly skilled worker.   (R. 151.)

*Netsuke* is a Japanese art form which began in the 17th century. These objects were first made of different materials and for practical

uses, to secure the strings of a pouch or the sash of a kimona. There developed a special art of carving *netsuke* in figures taken from legends, or fairy tales. Mrs. Young knew of no collection of oriental art that did not include *netsukes*, including the collections in the Freer Gallery and in the Metropolitan Museum of Art. The enthusiasm for collecting *netsukes* is not now as great as it was "some years ago." The Japanese have the best collection of *netsuke*. Off-hand, she could not remember the names of artists well recognized in the East for their expression in *netsuke* form, but this could be found through research. (R. 155.)

She did not know who carved exhibit 41, which is *netsuke*. *Netsukes* tend to be fairly original with the individual artist, except that the concept may have come from another *media*, such as a painting. (R. 157.) There is a wide range of *netsukes*. Some are produced for sale to tourists, and are inexpensive. The only way you can distinguish between them is by the quality of material and the skill of workmanship. She would not go so far as to say that a skillful reproduction is always in itself, a work of art. (R. 161.) A work of art is a complicated concept, which Mrs. Young preferred not to try to define. She did not know who executed any of the exhibits before the court. (R. 162, 163.)

Under cross-examination, Mrs. Young stated that the distinction between what is merely decorative and what is art varies from area to area, and from time to time. The traditional breakdown, in Western art, between the fine arts and the decorative arts, does not exist in prehistoric art or in ancient, Near Eastern, Chinese or Japanese art. Architecture, to the Chinese, was not a fine art, whereas ceramics was. (R. 164.)

Mrs. Young was not familiar with the term "free fine art" and said it was not used in her field of competence, where objects are treated and discussed piece by piece. (R. 166.) Exhibit 3 aside, Mrs. Young testified that she had not seen the originals of any of the sample exhibits. They are, however, all traditional. (R. 167, 168.)

Asked to state the basis of her testimony that the exhibits were sculptured reproductions, Mrs. Young said:

These are skillful reproductions. In the case of the jade horse, exhibit 19, we know the photographs and know the collection so that whether I have seen this recently or not we do have an exact prototype for that. The others can be found in publications on the subject, perhaps not the precise one that the sculptor is copying but the class of object to which this individual example belongs.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

\* \* \* there are publications, published works on each of these areas or on the Chinese decorative or Japanese Buddhist sculpture. So that we know both from museum collections and from published works the class of object to which these belong. Then the specific prototype which is being copied I can't pin down for you precisely as to collection. \* \* \* [R. 169.]

\*   \*   \*   \*   \*   \*   \*

I would, if I were researching this, suppose it was a museum problem for me and I were researching it, I would look specifically for prototypes, that teapot, incense burner——

\*   \*   \*   \*   \*   \*   \*

I would look for specific prototypes either in painting or sculpture, for the small seated mandarin emperor and empress.

\*   \*   \*   \*   \*   \*   \*

For a specific one for the seated Buddha with the crown.

\*   \*   \*   \*   \*   \*   \*

I would not worry about a specific prototype for a Hotei. He is in the tradition. [R. 170.]

\*   \*   \*   \*   \*   \*   \*

\* \* \* She [exhibit 16] is within the tradition so completely that the artist does not necessarily need a prototype. She exists. The same is true for the lady with the flowers, the tallest ivory, exhibit 32. They belong within. The ones that I have said look for a specific prototype for [sic] are involving and specific and belong to a known class of objects, and I would imagine that the artist is working from a specific mold, my guess on it. The ones that I have said I would not perhaps bother with are freer in form and they exist within the tradition too and it isn't that the artist doesn't need an exact one but they exist within the tradition. [R. 171.]

Mrs. Young further stated that the *blanch de chine* goddesses from Fukien Province, prized, admired, and collected in the 18th century, both by Western and Eastern collectors, were in form very close in appearance to exhibit 16. She had seen other objects in plaintiff's store like exhibit 16, but ordinarily she doesn't "worry" about reproductions or study reproductions as an art form, since she regularly studies only museum and private collections and books. (R. 172.)

She was asked to explain what she meant by different interpretations of the same traditional object or figure and said:

Your form is going to vary. If you work, if you are painting, or if you are working with clay or stone, the manner of carving changes somewhat from period to period. The way you slant your chisel, the kind of chisel you use. The lady may exist in one version on clouds, she may have more flowers, she can carry flowers down here, the scarves may go further out. But the basic conception and the basic handling of the curve lines and the general curving female figure, that's traditional for a very lone time. [R. 173, 174.]

Mrs. Young admitted that there are variations of the same theme in oriental art and that in the Ming and Ching periods it is difficult to pin down an object as to its date and style. (R. 175.)

Exhibit 16 is not identified as a Kwan Yin but its style is dependent on the Kwan Yin tradition, although somewhat simplified in the Ming version. Exhibit 16 differs from the Ming version in that the "cutting of the stone * * * is somewhat more angular than the 15th, 16th, 17th century cutting would be, more like French art of the 1930's and '40's. The artist [she said] does not live separate from his time even when he is reproducing a work of art. And in the way he cuts and his feeling for his material he does show his time." (R. 175.) But, she explained, this would not be true *for reproductions* because there *you work from a cast.* Mrs. Young further testified that exhibit 16 follows the traditional lines in every respect which one would consider important, even though carved in the 20th century. (R. 176.) The skill with which exhibit 16 was carved indicated to Mrs. Young that the person who executed it was completely at home in carving and knew how to carve hard stone, which is difficult to do. She described exhibit 16 as skillfully done, a pleasing organization of line (form), graceful in concept, and good enough to "hold its own as a work of art" even though not of museum quality. (R. 177.) Even if exhibit 16 were not within an identifiable tradition of art, Mrs. Young would still consider it a work of art, since she does not judge art according to the name of the artist. (R. 179.)

Mrs. Young would rule out a reproduction of a work of art which was technically bad or of inferior material, or which missed the character of the original as a work of art. Imitations are not works of art. (R. 180.) There are differences between originals and skillful reproductions, complex to define but, as Mrs. Young stated the differences, "the work of art has more life, more esthetic appeal * * * than a skillful reproduction. * * * the person who knows the original from which they [reproductions] are taken has a different set of criteria from a person who sees them for the first time and doesn't know them [originals]."

Mr. Sokolow, plaintiff's other witness, testified that the exhibits and the merchandise of the protests were purchased by Allen Hartman on trips to Japan, Hong Kong, and Siam; that he, Mr. Sokolow, wrote to shippers and ordered particular items from photographs which he sent to the shipper, or on reorders of items previously imported; that sometimes an order would be placed, merely describing the type of item desired or its conception; and that, on occasion, orders would be placed on the basis of prior samples sent by the shipper. (R. 62.)

Photographs used as a basis for orders included some taken from the catalogs of auction galleries in New York City (as, for example, the catalog of Parke Bernet), and London galleries (Sothesby and Christie). The photographs from auction catalogs also carry a catalog description of the item, the material of which made, and give the names of the collection or museum where the item is to be found. (R. 64.)

Mr. Sokolow stated that the imported items were sold to dealers in art and antiques, to galleries, and to stores merchandising oriental art objects. Sales were also open to the general public at the retail level.

He testified as to the prices at which various of the exhibits were sold. These ranged from a wholesale price of $10 and a retail price of $24 for exhibit 41, to a wholesale price of $400 and a retail price of $1,000 for exhibits 19–A and 19–B as a pair. Prices include a mark-up for additional costs before delivery in the United States (duty, freight, etc.), but also take into consideration the current market for items, in terms of what people are willing to pay. (R. 69.) Scarcity of the material of which an item is carved also increases its value. The expertise and skill with which the carving is executed affects value.

On cross-examination Mr. Sokolow stated that plaintiff's orders are placed directly with the shippers of the merchandise. He did not know at first hand who carved or made various invoice items. One of the shippers, Kyo Trading, he knows is merely an agent. Tsuchiya Kasho, another shipper, has its own workshops. Items from Tsuchiya Kasho include exhibits 16, 17, and 23.

He is familiar with item 286, a semi-precious stone carving of a cow, which is listed on the invoice of entry 1018831. He saw this item when it was imported; in fact, he has shown it to customers, and he identified it as an exact reproduction of a photograph, plate LV, in a book entitled "Chinese Jade Throughout the Ages" by Nott, describing a jade buffalo or ox. (R. 184.) He admitted, on cross-examination, that he had not seen the original object, as distinguished from the picture of it in the book. (R. 185.) He said he could testify that item 286 was an exact reproduction, because it has definite characteristics which can be discerned from looking at the picture, and if you are familiar with carvings in the tradition in which item 286 was done you can tell from the front of the picture what the carving in the back *should* be like. (R. 186.)

Defendant makes the point that these protests do not protest the classification of any articles that are represented or illustrated by exhibits 39 to 42, inclusive. Protest 63/6594 is against the classifica-

tion of coral carvings which were assessed at 42½ percent ad valorem under paragraph 233. The testimony of record (as well as our examination of exhibits 39 to 42) shows that these are ivory carvings. The official papers disclose that they were assessed at 15 percent, under paragraph 1538, as manufactures of ivory.

There are in the record certain photographs said to illustrate coral carvings which are a part of the merchandise of protest 63/6594. However, inasmuch as there is no protest claim as to the ivory carvings that are represented or illustrated by exhibits 39 to 42, inclusive, those exhibits and the testimony with regard to them are stricken.

Mr. Sokolow identified each of the photographic exhibits with an imported article. He gave no opinion as to artistic merit of the articles. Indeed, he was not held out as an artist qualified in the field of ancient oriental art.

Mrs. Young, plaintiff's other witness, said she never had seen the imported articles said to be illustrated by the photographic exhibits. She gave testimony as to them solely on the basis of what she found represented, on examination of the photographs.

Plaintiff argues that the testimony of Mrs. Young, who was qualified as an expert in ancient oriental art, should be accepted as adequate proof of the artistic merit of articles which she never had seen, and as to which she formed her opinion solely from inspecting photographs of the articles.

Under the circumstances of this case, it is doubtful, to say the least, that the photographs and the related testimony are competent evidence of artistic merit of objects of sculpture and statuary. Photographs do not always accurately reproduce all aspects of what is depicted, and they may not afford an adequate basis for judging whether the photographed object is a work of art. This is particularly true as to three-dimensional objects, such as those in issue here. *United States* v. *Mrs. Adelaide Ehrich*, 22 CCPA 1, T.D. 47019; *O. O. Friedlaender Co.* v. *United States*, 19 CCPA 198, T.D. 45295; *Marshall Field & Co.* v. *United States*, 5 Ct. Cust. Appls. 191, T.D. 34324.

In another *Friedlaender* case (*O. O. Friedlaender Co.* v. *United States*, 55 Treas Dec. 776, T.D. 43393), Justice Waite said:

In deciding the question as to whether these importations are in fact works of art we have to be guided by the testimony and evidence in the form of exhibits. In many of the importations included here samples were not produced. Dependence was placed upon photographs purporting to represent the goods, * * *.

\* \* \* \* \* \* \*

We sustain the protests in so far as they cover the merchandise as to which samples were produced and overrule them as to that which was represented by photographs. [P. 778.]

See, also, *John Wanamaker* v. *United States*, 57 Treas. Dec. 986, T.D. 44115, in which the court said:

\* \* \* where the question is whether or not certain articles are works of art either under paragraph 1449 or 1704 (Tariff Act of 1922), it is not possible to render an intelligent judgment unless the articles are produced for inspection of witnesses and the court. \* \* \* [P. 988.]

Our appeals court, in *George D. Spiers* v. *United States*, 47 CCPA 118, C.A.D. 742, said that the competence of testimony based on a photograph alone, as to the artistic merits of a *stained glass window*, rested on "the circumstances of this case." (P. 122.) We do not read the opinion of our appeals court in *Spiers* as supporting the competence of testimony, on the facts here, based solely on inspection of photographs by the expert witness. The protest is overruled as to the articles that are represented or illustrated solely by photographic exhibits, 31 in all.

As to the remaining 20 items, for which there are in evidence specimen exhibits, Mrs. Young testified variously as to different items.

She said of exhibit 23 that, while skillfully executed, "It's not a distinguished piece." (R. 107.) Asked whether she considered it a work of art, she replied: "Within the definition, its purpose, the carving, a reproduction of a native form, an art form, the elephant in art rather than the elephant in nature, *I suppose so.*" (R. 107.) [Emphasis added.]

This is not such definite opinion of artistic merit by a qualified expert as plaintiff's claim calls for, in order to prove that this elephant is either a work of art, in itself, or a copy of a piece of sculpture of statuary which is a work of art. Scrutiny of exhibit 23 confirms Mrs. Young's unenthusiastic evaluation of its artistic merit. The claim, as to the importation represented or illustrated by exhibit 23, is overruled.

There remain for consideration 19 specimen exhibits, all said to be representative or illustrative of imported articles included in the entries of these protests. Mrs. Young was firm in her opinion that these are works of art, either of themselves or as good copies of reproductions of known works of art.

Three of the 19 are shown to be copies, but not copies of sculptures or statuary. They are the items represented or illustrated by exhibits 27, 31, and 32. Mrs. Young described exhibit 27 as a carved ivory vessel, representative of a metal incense burner; exhibit 31 as an ivory teapot; and exhibit 32 as a vessel carved in ivory. Our inspection of these exhibits confirms her descriptions. They are not copies of objects included within the terms sculpture or statuary.

However, Mrs. Young was firm in her evaluation of exhibit 31 as a work of art *in its own right*. Even though not a copy or reproduction of a sculpture or statuary, we accept her opinion that it is a work of art, and the protest claim for its classification under paragraph 1547(a) is sustained.

As to exhibit 27 (the ivory vessel), Mrs. Young said it was a good copy of an 18th century metal incense burner, which was a work of art. The difficulty here is that paragraph 1547(a) does not include, in its classification, all good copies of works of art, but only such as are copies of statuary and sculpture. The protest claim as to the item represented or illustrated by exhibit 27 is overruled.

Testifying as to exhibit 32, Mrs. Young identified this as a copy (vessel carved in ivory) of what was "probably Ming copy of a middle Chou phase." (R. 112.) Here, as in the case of exhibit 27, the protest claim is overruled, on the facts of record and the law.

Exhibit 9 and exhibits 19–A and 19–B were, in Mrs. Young's opinion, copies made from photographs or paintings, and hence not copies an artist had made of statuary or of sculpture.

Exhibit 9 is a jade horse which Mrs. Young said is a good reproduction of a Sung period horse, but she said that, in her opinion, the artist worked from a photograph. She explained the grounds for her opinion. She did not ascribe this piece artistic merit in itself. The claim as to the item represented or illustrated by exhibit 9 is overruled.

Exhibits 19–A and 19–B are a pair of Japanese dancing horses; but Mrs. Young knows only a painting which, in her opinion, is the prototype of the horses. If there is an original in sculpture, she has not seen it. As to these horses, however, Mrs. Young found them to be "a cheerful art and art for art's sake." While probably this would be insufficient to support a claim under paragraph 1807, we find this adequate *prima facie* proof of the degree of artistic merit which paragraph 1547(a) requires.

Mrs. Young could not identify the artists who executed exhibit 31 and exhibits 19–A and 19–B, or exhibits 3, 5, 6, 8, 16, 17, 28, 29, 30, 45, 46, 47, 51, and 55. Nor did she know who were the artists who executed the known works of art of which copies or reproductions are included among these exhibits. Her testimony is that all these objects either possess artistic merit in themselves, or are artistic copies of sculptures or statuary which are works of art.

Defendant argues that proof of the identity of the artist is a *sine qua non* for classification of an object as a work of art under paragraph 1547(a). We turn now to defendant's argument that plaintiff's protest claim must fail, notwithstanding expert opinion as

to artistic merit, because the artists who executed the works represented by these exhibits have not been identified.

Known identity of the artist, coupled with competent testimony of his artistic reputation, is potent proof in support of a claim to classification of the works of that artist as works of art. When such a record can be made, plaintiff's problem of proof is greatly eased.

We are not called upon here to decide whether an anonymous piece of sculpture or painting might, notwithstanding the anonymity of the artist, be classified as a work of the free fine arts. That question is not before us. What we are called upon to decide is whether known identity of an artist is a requirement Congress has imposed as to works of art that are dutiable under paragraph 1547(a), and more particularly as to copies or reproductions of sculpture or statuary the monetary value of which may be as low as $2.50.

Here we have in evidence, as to the 16 exhibits now under our consideration, opinion evidence that they have artistic merit and were executed by unknown artists, given by a witness who was qualified as an expert in oriental art. Her opinion was not shaken on cross-examination. Defendant introduced no evidence in rebuttal.

Some confusion in the cases appears to have resulted from a lack of differentiation between the standards set by Congress for works of the free fine arts (paragraph 1807, free entry) and other works of art (paragraph 1547, dutiable). The claim that these are works of the free fine arts, under paragraph 1807, having been abandoned, we have before us only the claim for dutiable classification under paragraph 1547(a).

In *Wm. S. Pitcairn Corp.* v. *United States*, 39 CCPA 15, C.A.D. 458, our appeals court explored in depth the change in congressional intention that was indicated, in the Tariff Act of 1930, when for the first time Congress introduced the $2.50 valuation for copies, replicas, or reproductions of sculpture and statuary. The court said:

The Congress did not create the new law embraced in paragraph 376 of the 1913 tariff act idly, nor has it been retained idly. The amendment as to valuation adopted by the Congress which passed the 1930 Act is believed to have a significance which aids in interpreting the paragraph. That phraseology has not been considered by us previously.

The Congress obviously intended that some forms of statuary and sculpture and copies, replicas, or reproductions of same should be classifiable under paragraph 1547(a), *supra*. If figurines, such as those here involved, are held not to be so classifiable, it seems to us the paragraph will be greatly mutilated even if not wholly emasculated. [P. 36.]

The court referred to *Friedlaender Co.* v. *United States*, 19 CCPA 198, T.D. 45295, which arose under the Tariff Act of 1922, paragraph 1449 (predecessor of paragraph 1547 of the 1930 Act, except as to the added provision in paragraph 1547 as to $2.50 valuation). In *Friedlaender*, the plaintiff's only witness was the importer, who testified that a model was made by some unknown, or at least unnamed, sculptor or artist. Discussing this record, the court in the *Friedlaender* case said:

The witness was unable to state the name of any sculptor or artist who had prepared any of the original models for these articles. He stated, in a general way, that they were made by artists, giving as his reason therefor that no one but an artist or sculptor could prepare such models. The witness was not an artist or sculptor, and *the testimony he gave was not that of an expert in art but of one who dealt in these articles as a commercial proposition.* [P. 201; emphasis added.]

We read this opinion language as requiring that a witness who is not an artist or an expert in art, and therefore not qualified to express an expert artistic opinion, may testify that a work is that of an identified sculptor or artist, but not that it is the work of an unidentified artist, since he lacks competence to form that opinion.

However, if the witness is qualified as an artist or as an expert in art, which the witness in *Friedlaender* was not, he may state his opinion as to artistic merit; and this is so whether he knows the name of the artist or does not know it.

Works of oriental art, shown by competent testimony to be of artistic quality, have been held entitled to classification under paragraph 1547(a) or predecessor paragraphs of prior tariff acts, without identification of the artist. *O. O. Friedlaender Co.* v. *United States*, 55 Treas. Dec. 776, T.D. 43393.

In *S. & G. Gump Co.* v. *United States*, 63 Treas. Dec. 303, T.D. 46180, the court pointed out certain differences under paragraph 1708 of the Tariff Act of 1922 (predecessor of current paragraph 1807) and paragraph 1449 (predecessor of current paragraph 1547). Plaintiff had not filed the required affidavit (Customs Form 3343) for free entry under paragraph 1708, and plaintiff's claim thereunder was denied. Although the only evidence as to identity in the *Gump* case was that the objects in litigation were produced in China during the Kien Lung dynasty, there was expert evidence of their artistic merit. The court said:

With respect to the claim under paragraph 1449 of the same act we find that the weight of the evidence introduced at the trial estab-

lishes *prima facie* that these two vases are works of the free fine arts within the meaning of paragraph 1449. Since there are no mandatory customs regulations under paragraph 1449, and the defendant has introduced no competent evidence to overcome the testimony of plaintiff's expert witnesses, we find that these two spinach-green jade hanging vases are dutiable at 20 per centum ad valorem under that paragraph. * * * [P. 306.]

See also, *Henry H. Hart* v. *United States*, 64 Treas. Dec. 570, T.D. 46748.

As to the entry objects represented or illustrated by exhibits 31, 19–A and 19–B, 3, 5, 6, 8, 16, 17, 28, 29, 30, 45, 46, 47, 51, and 55, discussed, *supra*, expert opinion ascribes to them such artistic merit as paragraph 1547(a) requires. As we said in *Ebeling and Reuss Co.* v. *United States*, 40 Cust. Ct. 387, C.D. 2009 :

* * * Under the *Pitcairn* case, the provisions of paragraph 1547, as originally enacted and as amended, have been extended to include articles of common commerce, possessing beauty and not created for utility, such as the objects involved herein. [P. 394.]

The protests are sustained for classification under paragraph 1547(a) of entry merchandise represented by exhibits 3, 5, 6, 8, 16, 17, 19–A, 19–B, 28, 29, 30, 31, 45, 46, 47, 51, and 55.

The evidence of record establishes that the objects represented by exhibits 5, 6, 16, 19–A and 19–B (a pair), 28, 29, 30, 31, 45, 46, and 55, are works of art, but it does not establish that they are such copies or reproductions as paragraph 1547(a) describes. As to the objects represented by exhibits 3, 8, 17, 47, and 51, the record establishes that they are such copies or reproductions, of a value of at least $2.50 each, of statuary or sculptures that are works of art.

Inasmuch as the paragraph 1547(a) rate modification to 10 percent ad valorem is not applicable to works of art, not specially provided for, but only to copies or reproductions of statuary or sculptures which are works of art, the objects entitled to classification as such copies or reproductions, dutiable at 10 percent ad valorem, are those represented by exhibits 3, 8, 17, 47, and 51. The objects represented by exhibits 5, 6, 16, 19–A and 19–B, 28, 29, 30, 31, 45, 46, and 55 are entitled to classification as works of art, not specially provided for, with duty at 20 percent ad valorem; but as to any such on which the duty assessed was less than 20 percent the collector, on reliquidation shall assess no higher duty rate than the rate at which he originally liquidated the merchandise.

The claim to classification under paragraph 1807, having been abandoned, is dismissed.

As to all other merchandise and all other claims the protests are overruled.

*Judgment will be entered accordingly.

(C.D. 2629)

*To simplify reliquidation, the status of objects said to be represented by the exhibits is summarized as follows:

