(C.D. 3445)

EXPRESS FORWARDING & STORAGE CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 8, 1968)

*Siegel, Mandell & Davidson* (*Allan H. Kamnitz* and *David Serko* of counsel) for the plaintiff.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Richard J. Kaplan, Sheila N. Ziff, Andrew P. Vance*, and *Dominick M. Minerva*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: There was imported at the port of New York an article described on the commercial invoice accompanying the entry covered by the above-enumerated protest as a "Tester for main altar". The dutiable status thereof, whether subject to duty as classified or entitled to free entry or to a lower rate of duty than assessed, is here presented to the court for determination by protest timely filed in accordance with the provisions of Title 19, U.S. Code, section 1514, by the nominal consignee of the importation. The ultimate consignee thereof was the Cathedral of the Blessed Sacrament in Altoona, Pennsylvania.

At the outset, let us explain that a "tester" is defined in standard lexicographic authorities as comprising, *inter alia*, a flat canopy for an

altar. A tester is more or less synonomous with a baldachin or a civory, which terms will appear later in this decision, a difference being that a tester is generally suspended whereas a baldachin or civory is supported by pillars.

The tester in controversy was classified for tariff purposes within the purview of paragraph 397 of the basic Tariff Act of 1930 as an article not specially provided for, wholly manufactured, plated with gold, for which duty at the rate of 65 per centum ad valorem is provided.

Among numerous claims made either in the protest as filed or by amendment thereof at the time of hearing is the claim for free entry of the imported article as a part of an altar or as a shrine or a part thereof within the provisions of paragraph 1774 of said tariff act, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation 2888, 85 Treas. Dec. 138, T.D. 52476. The language of said paragraph 1774 is here set forth in pertinent part:

Altars, pulpits, communion tables, baptismal fonts, shrines, or parts of any of the foregoing, * * * imported in good faith for presentation (without charge) to, and for the use of, any corporation or association organized and operated exclusively for religious purposes_____ Free

Prior to the introduction of evidence in this case, a stipulation of fact was entered into by the adversary parties to the effect that the merchandise involved herein was imported in good faith for use of and by order of the Archdiocese of Altoona, Johnstown, Pennsylvania, an association organized and operated exclusively for religious purposes.

In support of its claims under paragraph 1774 of the Tariff Act of 1930, as modified, *supra*, plaintiff offered the testimony of Monsignor Rodney F. Hemler, Chancellor of the Diocese of Altoona, Johnstown, Pennsylvania, Secretary to the Bishop of that diocese, and Notary of the Diocesan Tribunal. His duties as Chancellor include taking care of the business affairs of the diocese for the Bishop and assisting the Bishop in administrative matters. Of the 9 years since he was ordained, 6 of said years were spent as Vice Chancellor and Chancellor of the Altoona Diocese, and for 2 years Monsignor Hemler was the Vice Rector of the Cathedral of the Blessed Sacrament in Altoona, Pennsylvania, where the imported tester is installed, and where he is always present when the Bishop pontificates, assisting in such services as archpriest.

Pictures of the involved tester in place above the main or high altar of the Cathedral of the Blessed Sacrament at Altoona were received in evidence as plaintiff's exhibits 1 and 2, the tester portion of the pictures being encircled in ink.

The imported article was described by Monsignor Hemler as being of the sunburst type. It measures approximately 12 feet in diameter and is suspended from the ceiling about 30 feet above the main altar. The tester at bar has a blue enameled center field imposed upon which in gold are the letters "IHS", with the letter "H" surmounted by a cross. Said letters and symbol are representative of the name of "Jesus" and by calling to the minds of the congregation that sacred name it aids the worshippers in their devotions. Extending from the center field of the tester are bands or strips of golden metal simulating rays emanating from a sunburst. It was explained that canon law requires that a tester or baldachin should cover the main altar and the predella upon which the altar is placed.

According to Monsignor Hemler, a liturgical altar consists of a mensa or table and the supports upon which it rests, together with required appurtenances such as altar cloths, candlesticks and candles, a crucifix and a tester.

Plaintiff's claim that the imported tester should have been classified as a part of an altar within the purview of paragraph 1774 of the Tariff Act of 1930, as modified, although not specifically abandoned was not urged by the plaintiff in its brief.

In the case of *Castelazo & Associates et al.* v. *United States*, 54 Cust. Ct. 460, Abstract 69373, this court held that a baldachino, which as indicated above is similar in design and purpose to a tester, was not part of an altar in paragraph 1774 of the tariff act. And in the subsequent case of *John Horvath Company* v. *United States*, 59 Cust. Ct. 397, C.D. 3174, this court stated:

It has been held that the term "altar" in paragraph 1774, *supra*, includes only the altar, *per se*, and not articles not physically attached to it or which constitute a setting for the altar and whose presence may be necessary for use of the altar in the performance of a ritual. Such articles as sanctuary lamps, mosaic inlaid floors, a wall facade or reredos covering the rear wall of an arched chamber in the sanctuary, and a reredos which formed the rear support of the canopy or baldachino, have been held not to be parts of altars. *Hogue* v. *United States*, 13 Ct. Cust. Appls. 587, T.D. 41437; *Daprato Statuary Co.* v. *United States*, 16 Ct. Cust. Appls. 233, T.D. 42840; *Daprato Statuary Co.* v. *United States*, 26 CCPA 173, C.A.D. 13; *Rambush Decorating Co. et al.*, *supra* [48 CCPA 123, C.A.D. 776].

Inasmuch as the instant tester is not a part of an altar *per se*, we, accordingly, hold that plaintiff's claim in the instant case that said tester should be so classified in paragraph 1774 of the Tariff Act of 1930, as modified, *supra*, cannot be sustained and will be overruled.

It is urged, however, that the instant importation is encompassed by the provision in said paragraph 1774 for shrines and parts thereof. Said provision has been the subject of much litigation, among the latest

of which cases may be cited *United States* v. *Greek Orthodox Church of Evangelismos*, 49 CCPA 35, C.A.D. 792. In that case, an iconostasis described as "an elaborately adorned structure made of wood extending clear across the church, but not reaching to the ceiling, and separating the greater part of the altar sanctuary from the rest of the church", one of the functions of which was to hold and display icons which were placed before the congregation as visible aids to worship, was held to be a shrine or part of a shrine within the provisions of paragraph 1774 of the Tariff Act of 1930.

Other instances of articles held to be shrines or parts thereof are *C. Wildermann Co.* v. *United States*, 56 Treas. Dec. 572, T.D. 43713, wherein terra-cotta religious statuary arranged as Stations of the Cross representing various stages in the passion of Christ was held to constitute shrines for tariff classification purposes; *Nicholas J. Stevason* v. *United States*, 32 Cust. Ct. 469, Abstract 58041, which held that icon prayer stands for use in a Greek Orthodox Church were parts of shrines; and *The Gasparri Studios* v. *United States*, 33 Cust. Ct. 470, Abstract 58614, where a number of pieces of marble and a bronze grille which when assembled were to enclose a picture of the Madonna and Child for installation in a Roman Catholic Church were held to be parts of shrines.

In the *Wildermann* case, *supra*, consideration was given to the meaning of the word "shrine", and the following language in that connection is here quoted—

* * * Murray's New English Dictionary, volume 8, page 779, defines a shrine as "a receptacle containing an object of religious veneration—a niche for sacred images. A place where worship is offered or devotions are paid to a saint or deity." It appears that although a shrine was originally a tomb containing the bones of saints or other sacred person, the meaning of the word has, through the ages, been recognized by the lexicographers to have enlarged in scope so as to embrace a receptacle containing an object of religious veneration, such as a niche for sacred images. It is clear, therefore, that pieces of statuary, having carved therein scenes representing Christ on the way to the Cross, and having as their purpose the creation of religious veneration in man, are shrines. * * *

At the request of counsel in the instant case, plaintiff's witness Monsignor Hemler indicated on plaintiff's exhibit 2 by an encircling line and the letter "A" that portion of the interior of the Blessed Sacrament Cathedral which is known as the sanctuary. Encompassed in that area are the main altar, the predella, the tester, the altar appurtenances, and furnishings including the sedilia (seats near the altar for the officiating clergy), the Bishop's throne and the choir stalls. According to Monsignor Hemler, the sanctuary is a shrine inasmuch as it is a place set apart from the nave of the church where official

ceremonies of the church take place, where devine worship is held, and devotions are directed to the adoration or veneration of God, Himself, in the form of the Blessed Sacrament. In fact, according to the testimonial record, Monsignor Hemler's conception of a shrine or a part thereof would encompass a church as a whole with its pews and other furnishings.

As to the function and purpose of a tester, Monsignor Hemler stated at one point in his testimony that in ancient times the purpose of a tester or canopy was to protect an altar from dust or other matter falling from the high ceiling but that today its purpose is to embellish the altar over which it is suspended and to focus the attention of the worshippers in their devotions as an aid to lifting up their minds and hearts to God.

Whereas there may be some merit to the contention that, since it is within the sanctuary of the Cathedral that worship is offered and devotions paid to God that said sanctuary constitutes a shrine as that term is generally understood, to so construe the provision for shrines and parts thereof in paragraph 1774 of the Tariff Act of 1930 would be to turn away from the clear-cut, unambiguous legislative language and deprive the statutory provision of the specificity with which it was enacted. As was stated in the case of *United States* v. *St. Joseph's Church*, 48 CCPA 42, C.A.D. 761, in construing the provisions of paragraph 1774 of the tariff act with which we are here concerned—

We are aware of the expressions on the part of the Supreme Court and other courts that provisions relating to articles imported solely for religious purposes "should be liberally construed in favor of the importer, and if there were any fair doubt as to the true construction of the provision in question the courts should resolve the doubts in his favor." [Citing *Bensiger* v. *United States*, 192 U.S. 38.] In this case we do not have such doubt. The intent of Congress in enumerating five specific pieces of ecclesiastical furniture or architecture, and no more, and in failing to include any general phrase such as "and similar articles" was certainly not to invite a strained construction in order to allow free entry for all kinds of church furniture.

In the light of the testimony presented and the foregoing considerations, we are of the opinion that to construe everything within the confines of the sanctuary indicated on plaintiff's illustrative exhibit 2, which would include the tester at bar, as comprising a part of a shrine, would be to expand the free list of articles of church furniture granted the benefit of free entry "under the guise of a 'liberal' construction beyond the plain meaning of the terms used." *United States* v. *Greek Orthodox Church of Evangelismos, supra.*

Accordingly, we hold plaintiff's claim that the imported tester is a shrine or a part thereof within the purview of paragraph 1774 of the

Tariff Act of 1930, as modified, *supra*, to be untenable. In so holding, we are reminded of the statement of the appellate court in the case of *United States* v. *Buck's, Inc.*, 47 CCPA 12, C.A.D. 721, that—

While it may seem to the benefactors of religious institutions to be a hard judgment to hold that importations intended for presentations to churches should be charged with import duties, the courts must carry out the will of Congress, which has seen fit to enumerate as duty free only a small fraction of the many possible furnishings of churches. See *St. Alban's Episcopal Church v. United States*, 22 CCPA 366, T.D. 47387, at page 374.

Consideration will now be given to the plaintiff's further claims that the imported tester should have been classified as a work of art, either duty free pursuant to paragraph 1807, 1809, or 1810 of the Tariff Act of 1930 or as amended, or subjected to a rate of duty provided by paragraph 1547 (a) (2) of said act, as modified by the Annecy protocol, *supra.*

Both at the time of hearing and of briefing, plaintiff stated it did not press its claims pursuant to paragraphs 1809 and 1810 of the tariff act but that it did not abandon said claims. For works of art to find classification within the provisions of said paragraphs 1809 and 1810, certain requirements must be met, such as evidence that the importation was for exhibition purposes or for erecting a public monument, or that it was a work of art produced by an American artist residing temporarily abroad. Inasmuch as the evidence here presented is not directed to nor sufficient to meet the requirements of either paragraph 1809 or paragraph 1810 of the Tariff Act of 1930, plaintiff's claims thereunder will be overruled.

There remains for consideration and disposition plaintiff's claims pursuant to paragraph 1807 (a) of the Tariff Act of 1930, as amended by Public Law 86–262, 73 Stat. 549, and paragraph 1547 (a) (2) of said act, as modified by the Annecy protocol, *supra.* The specific language of said provisions is here set forth:

Paragraph 1807 of the Tariff Act of 1930, as amended, *supra*—

(a) Original paintings in oil, mineral, water, vitreous enamel, or other colors, pastels, original mosaics, original drawings and sketches in pen, ink, pencil, or watercolors, or works of the free fine arts in any other media including applied paper and other materials, manufactured or otherwise, such as are used on collages, artists' proof etchings unbound, and engravings and woodcuts unbound, lithographs or prints made by other hand transfer processes unbound, original sculptures or statuary; but the terms "sculpture" and "statuary" as used in this paragraph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, metal, or other materials, or whether cut, carved or otherwise wrought by hand from the solid block or mass of marble, stone, alabaster, or from metal, or other material, or cast in

bronze or other metal or substance, or from wax or plaster, or constructed from any material or made in any form as the professional productions of sculptors only, and the term "original", as used in this paragraph to modify the words "sculptures" and "statuary", shall be understood to include the original work or model and not more than ten castings, replicas, or reproductions made from the sculptor's original work or model, with or without a change in scale and regardless of whether or not the sculptor is alive at the time the castings, replicas, or reproductions are completed. The terms "painting", "mosaic", "drawing", "work of the free fine arts", "sketch", "sculpture", and "statuary", as used in this paragraph, shall not be understood to include any articles of utility or for industrial use, nor such as are made wholly or in part by stenciling or any other mechanical process; and the terms "etchings", "engravings", and "woodcuts", "lithographs", or "prints made by other hand transfer processes", as used in this paragraph, shall be understood to include only such as are printed by hand from plates, stones, or blocks etched, drawn, or engraved with hand tools and not such as are printed from plates, stones, or blocks etched, drawn, or engraved by photochemical or other mechanical processes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Paragraph 1547(a)(2) of the Tariff Act of 1930, as modified, *supra*—

Works of art, not specially provided for:
　　Statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50__ 10% ad val.

In support of these contentions, plaintiff presented the testimony of Edward J. Byrne, designer of ecclesiastical art and owner of a firm known as Edward J. Byrne Studios, engaged primarily in designing altars, mosaics, and stained glass appointments for churches. Also offered in evidence in this regard was the testimony of R. J. Devroye, associated with the firm of Devroye et Fils, S.A., of Brussels, Belgium, taken by deposition pursuant to a commission issued to the American Consul at Brussels. Said deposition was received in evidence as plaintiff's collective exhibit 5 subject to certain objections thereto raised by defendant involving certain of the questions and answers contained in said deposition, a ruling on which objections was reserved to be passed upon at the time of decision.

Plaintiff contends that defendant's objections, insofar as they relate to questions contained in said deposition, are out of time and have been waived inasmuch as they were not filed with the clerk of the court in accordance with rule 21(f) of the rules of this court. Defendant alleges, however, that its objections both to the questions and answers are properly before the court when rule 21(f) is read, as defendant contends it should be, in connection with rule 21(g). In support of its position, defendant cites the case of *Ross Products, Inc.* v. *United States*, 43 Cust. Ct. 186, C.D. 2124, affirmed on the merits in 48 CCPA 1, C.A.D. 752.

For the purposes of this case and without further discussion, in view of the decision which will be reached herein, we make the following rulings: Defendant's objections to question 8, 8a, 10, and 16c, evidently on the grounds of immateriality and irrelevancy, and its objection as to question 9 as calling for a self-serving answer are overruled. Defendant's objections to answers 8a, 10a, and 19a as not being responsive and to answers 16c, 16d, 16e, 16f, 17, and 19a as being self-serving are overruled. Its objection to answer 9 on the latter ground is sustained.

From the record before the court, it is evident that on this phase of the case the plaintiff is relying on the contention that the article in issue is a "sculptured" work of art. By specific statutory language the term "sculpture" as used in said paragraph 1807(a) "shall not be understood to include any articles of utility". And by judicial construction a like exclusion has been ascribed to the term "sculpture" in paragraph 1547(a)(2). Note in the latter regard *Abercrombie & Fitch Company* v. *United States*, 49 CCPA 129, C.A.D. 808, at page 133.

During the course of the trial of this case, the definition of "Altar-Canopy" appearing in The Catholic Encyclopedia (1934), volume 1, at page 347, was read to Monsignor Hemler by Government counsel. Monsignor Hemler stated that he agreed with said definition and added that the tester presently in issue is representative of such a canopy. In the definition of "Altar-Canopy" referred to, there appears the following:

\* \* \* The purpose of this canopy is to protect the altar from dust or other matter falling upon it from the ceiling, which, being usually very high, cannot be conveniently or easily cleaned. \* \* \*

Subsequently on redirect examination, as has been mentioned above, Monsignor Hemler testified that whereas that was the purpose of the tester in ancient times its purpose today is to embellish the altar over which the tester is suspended in order to focus the attention of the worshippers as an aid in their devotions.

It is to be noted, however, that the language of The Catholic Encyclopedia, prepared and published in the 20th century, previously agreed to by Monsignor Hemler, states the utilitarian purpose of protecting the altar from dust in the present tense and does not relate that purpose only to "ancient times".

Moreover, from the testimony of Monsignor Hemler, it appears that it is a requirement of canon law that the main altar of a cathedral be equipped with a tester or baldachin over the main altar, which testimony stands uncontroverted. In this regard, it is interesting to note the following which appears in the New Catholic Encyclopedia (1967), volume 1, page 350—

ALTAR

\*        \*        \*        \*        \*        \*        \*

*Church Law.* A number of references have been made above to Church law regarding the altar. J. B. O'Connell summarizes (218) the law for the perfect altar:

It is a consecrated altar, standing clear of its surroundings, with no reredos—or with one that does not interfere with the current structure of the altar, the full veiling of the tabernacle, the proper position of the cross—and no fixed exposition throne. It is fully clothed with its frontal and altar cloths, *and surmounted by a canopy (civory, baldaquin, or tester.)* If the altar has a tabernacle, this will be entirely detached and fully veiled by its conopaeum. The altar cross will be such as to be clearly visible in all parts of the church. [Italics supplied.]

It is argued by defendant in its brief, with much show of reason, that "an article which fulfills the requirements of any law is utilitarian."

From the record before the court, it would appear that the tester at bar is primarily utilitarian in nature, both on the ground that it serves to protect the altar over which it is suspended from dust falling from the ceiling and on the further ground that it is a requirement of church law that the high altar of a cathedral be surmounted by a canopy, such as the instant tester.

That being the fact and regardless of the decorative nature of the article and the high degree to which it may complement the main altar over which it is suspended, the court holds that since it is primarily a utilitarian article it is precluded from classification in paragraph 1807 of the tariff act, as amended, by virtue of the specific language of said provision and from the scope of paragraph 1547 (a) (2) of said act, as modified, *supra*, by virtue of the analogous judicial construction referred to *supra*.

It is the duty of this court to construe the law applicable to controverted merchandise as it was in effect at the time of the importation of such merchandise. Predicated on this basis and after a careful consideration of the record before us, the able briefs presented by the adversary parties, and the numerous cases cited therein, the court holds that for the reasons stated above plaintiff's claims in the instant protest for classification within the purview of said paragraphs 1807 (a) and 1547 (a) (2) must be overruled.

To those benefactors or directors of religious institutions who consider the conclusion reached in this decision to be a harsh one, it may be pointed out that legislation passed subsequent to the instant importation (Public Law 87–604, 76 Stat. 403) would not only grant free entry to altars, which were given this benefit both under the Tariff Act of 1930 and under the predecessor Tariff Act of 1922, but also to "appurtenances, or adjuncts" thereof which, in a case such as

this, upon a proper showing, would likely result in a decision contrary to that herein reached.

Judgment will be issued in accordance with the views above expressed.