(C.D. 4141)

H. W. St. John & Co. v. United States

United States Customs Court, Third Division

(Decided December 7, 1970)

*Walter E. Doherty, Jr.*, for the plaintiff.
*Carl Eardley*, Acting Assistant Attorney General (*Glenn E. Harris* and *Robert E. Burke*, trial attorneys), for the defendant.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judges

ROSENSTEIN, Judge: The merchandise involved herein, entered in July 1963 as "stone carvings for church," was classified in liquidation under paragraph 234(c), Tariff Act of 1930, as modified by the 1960–61 Tariff Conference at Geneva, T.D. 55816, which provides for "other stone suitable for use as monumental or building stone, * * * otherwise manufactured" at a duty rate of 21 per centum ad valorem.[1] Plaintiff claims, alternatively, that the importations are entitled to entry free of duty either as original sculptures or statuary in relief under paragraph 1807(a) of said Act, as amended by Public Law 86–262, 73 Stat. 549, or as statuary "imported in good faith for the use of, either by order of, or for presentation (without charge) to, any corporation or association organized and operated for religious purposes * * *," under paragraph 1774 of said Act as amended by Public Law 87–604, 76 Stat. 403; or is dutiable at 8 per centum ad valorem under paragraph 1547(a) of said Act as modified by T.D. 55816, which provides for "Works of art, not specially provided for: * * * statuary, sculptures, * * * valued at not less than $2.50."[2]

The competing tariff provisions read as follows:
Classified:

Paragraph 234(c), as modified, *supra:*

> Freestone, sandstone, limestone, lava, and all other stone suitable for use as monumental or building stone, except marble, breccia, and onyx, not specially provided for:
> Hewn, dressed, or polished, or otherwise manufactured _____ 21% ad val.

---

[1] Classification under this paragraph is so indicated in the papers contained in the reconstructed file of this protest except for the Report of Collector on Protest (C.F. 4297), which lists the classification as "Act of 1930 par. 1774." This Report is patently erroneous and will be disregarded.

[2] Plaintiff's claim under paragraph 1810, which was not raised at the trial or in the brief, is hereby deemed abandoned, and is dismissed.

Claimed:

Paragraph 1807(a), as amended, *supra:*

\* \* \* works of the free fine arts in any other media \* \* \* original sculptures or statuary; but the terms "sculpture" and "statuary" as used in this paragraph shall be understood to include professional productions of sculptors only, whether in round or in relief, in bronze, marble, stone, terra cotta, ivory, wood, metal, or other materials, or whether cut, carved, or otherwise wrought by hand from the solid block or mass of marble, stone, alabaster, or from metal, or other material, or cast in bronze or other metal or substance, or from wax or plaster, or constructed from any material or made in any form as the professional productions of sculptors, only, and the term "original", as used in this paragraph to modify the words "sculptures" and "statuary", shall be understood to include the original work or model and not more than ten castings, replicas, or reproductions made from the sculptor's original work or model, with or without a change in scale and regardless of whether or not the sculptor is alive at the time the castings, replicas, or reproductions are completed. The terms "painting", "mosaic", "drawing", "work of the free fine arts", "sketch", "sculpture", and "statuary", as used in this paragraph, shall not be understood to include any articles of utility or for industrial use, \* \* \*.

Paragraph 1774, as amended, *supra:*

\* \* \* statuary (except granite or marble cemetery headstones, granite or marble grave markers, and granite or marble feature memorials, and excepting casts of plaster of Paris, or of compositions of paper or papier mâché), imported in good faith for the use of, either by order of, or for presentation (without charge) to, any corporation or association organized and operated for religious purposes, including cemeteries, schools, hospitals, orphanages, and similar nonprofit activities staffed and controlled by such corporation or association.

Paragraph 1547(a), as modified, *supra:*

Works of art, not specially provided for:
Paintings in oil or water colors, pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same; statuary, sculptures, or copies, replicas, or reproductions thereof, valued at not less than $2.50; \* \* \*. _____ 8% ad val.

Plaintiff's witness, Graham Carey, who worked successively, as an architect, maker of stained glass windows, silversmith, and farmer, testified that he designed and built a church in Benton, Vermont which, at the present time, is operated as a mission church in the Burlington, Vermont diocese.

The subject merchandise consists of two stone capitals,[3] each made from a solid block of limestone and weighing approximately 100 pounds, with carvings in bas relief on all four sides. The carvings on one capital depict four episodes in the life of the prophet Elias, as shown in four photographs comprising part of exhibit 2; the other capital, of which there are no photographs or other representations in the record, pertain to Moses. The carvings symbolize the entrance into Christianity from Judaism. The capitals "were put on the tops of the stone columns supporting, or supporting part of the weight of this [church] porch roof." The roof had formerly been "supported by wooden posts [as depicted in another photograph comprising exhibit 2] which were later done away with and the stone columns with the capitals were substituted."

The capitals, Carey explained—

> * * * are holding up pieces of wood which are built into the wall. The wall holds half of the weight and the capital holds the other half, except they probably hold less because they have the cantilever effect of the beam built into the wall.

He thinks that the roof "probably would" remain intact and in position without the capitals and columns. However, in describing the process of replacing the wood posts, the witness stated, on cross-examination—

> I think we probably propped up the horizontal beam, which had been held up by the wooden post, with a 2 x 4 so there would be no sinkage, and removed the wooden post and then put in the stone one. I would imagine that is what I would do.

The strut was used "so it wouldn't sag." The witness stated—

> I already said that I think the capital certainly supports some of the weight but doesn't support all of the weight, for whatever that may be worth.

In the witness' opinion, Peter Watts, whom he had commissioned to do the carvings herein, is a "very fine" sculptor, and the capitals are works of art comparable to those shown in the Fogg Museum at Harvard.[4] Carey also wrote an article on Watts' work which was pub-

---

[3] "Capital" is defined in *Funk & Wagnalls New Standard Dictionary,* 1942, as—
The upper member of a column, pillar, pier, or pilaster.

[4] These capitals were "originally at the head of pillars holding up the stone wall * * *."

lished in an official bulletin of The Catholic Art Association (exhibit 3), of which he was editor.

The witness, who had purchased the capitals in his own behalf, explained their subsequent disposition thusly:

> As I said before, the church now belongs to a small trust. I made it personally over to this trust, which will carry on the work of the church after my death, and ultimately it is presumed it will be taken over by the diocese.

Defendant's witness, chief structural engineer for the New England Division, Corps of Engineers, who is engaged in the design of buildings and structures in both the military and civil works program of the government in New England, and is a registered professional structural engineer in Massachusetts, defined a capital as the "upper portion of a column where it flares out to support members in the floor system or roof system above it."

He testified, on the basis of photographs of the church doorway with the wood posts (exhibit 2) and with the substituted stone columns and capitals (exhibit A), that the capital would "have to transport the load from the roof itself down into the stone column below it", and that it would have to be part of the structure of the building. The carvings do not contribute to the capitals' load bearing capacity.

We find on the record herein that the stone capitals assist in supporting the church porch roof, thus serving a utilitarian purpose. Although acknowledging their "utilitarian feature", plaintiff contends that this is outweighed by their "art features" and that the articles are original works of art within the purview of paragraph 1807(a).

However, by specific statutory language, the term "sculpture" as used in that paragraph "shall not be understood to include any articles of utility or for industrial use". *Express Forwarding & Storage Co., Inc.* v. *United States*, 60 Cust. Ct. 511, C.D. 3445 (1968). Thus, an original oil painting, considered to be a work of art and created solely for its aesthetic value, but imported for the sole purpose of being reproduced as a cover page on a magazine, has been held to be excluded from the free list provision of paragraph 1807 by reason of the aforequoted limiting clause. *United States* v. *J. E. Bernard & Co., Inc.*, 33 CCPA 166, C.A.D. 331 (1946). As the capitals unquestionably have utility, and are subject to the exclusionary provision of paragraph 1807, it is unnecessary for us to decide whether plaintiff has established that they are original works of art within the meaning of that paragraph. *Joseph A. Paredes & Co., a/c A. Guintoli* v. *United States*, 40 Cust. 471, Abstract 61618 (1958).

Turning to plaintiff's claim under paragraph 1547(a), we note that there is precedent for classifying works of art imported for util-

itarian or industrial purposes under this provision. *United States* v. *J. E. Bernard & Co., Inc., supra; Joseph A. Paredes & Co., a/c A. Giuntoli* v. *United States, supra* (marble statue imported for "utilitarian advertising") ; *Whitman Publishing Co.* v. *United States,* 6 Cust. Ct. 465, C.D. 517 (1941) (watercolor paintings imported to be reproduced in children's books) ; *American Colortype Co.* v. *United States,* 2 Cust. Ct. 132, C.D. 107 (1939) (oil paintings imported for reproduction on calendars).

However, in *Abercombie & Fitch Company* v. *United States,* 49 CCPA 129, 133, C.A.D. 808 (1962), holding that certain original three dimensional wall hangings were classifiable under paragraph 1547(a), our court of appeals stated that "no allegation has been made that the goods are articles of utility", and quoted from the trial court's decision in *Ebeling & Reuss Co.* v. *United States,* 40 Cust. Ct. 387, 394, C.D. 2009 (1958), wherein it stated:

> * * * The effect of the *Pitcairn* [5] case was to overrule earlier cases, including the *Adelaide Ehrich,* case and those cited therein, which limited the provision for works of art, in paragraph 1547 and its predecessors, to works of the free fine arts. Under the *Pitcairn* case, the provisions of paragraph 1547, as originally enacted and as amended, have been extended to include articles of common commerce, possessing beauty and not created for utility, such as the objects involved herein.

And in *Express Forwarding & Storage Co., Inc.* v. *United States, supra,* at page 519, it was noted that "by judicial construction a like exclusion [articles of utility] has been ascribed to the term 'sculpture' in paragraph 1547(a)(2)."

Thus, to bring them within the ambit of paragraph 1547(a), plaintiff must first establish that the capitals are essentially works of art. But the articles at bar "belong to a class or kind which ordinarily has utilitarian purposes and is not necessarily a work of art." *The Keepnews Co., Inc.* v. *United States,* 55 Cust. Ct. 160, 166, C.D. 2569 (1965). And, as the court observed in *Keepnews,* when an article is both decorative and utilitarian, inquiry must be made as to whether it is actually a work of art or merely a highly ornamented article. We find that the subject importation falls within the latter category and is thereby excluded from classification under paragraph 1547(a).

Whether or not the bas relief carvings *on* the capitals successfully carry out the religious theme intended by the church architect, or are

[5] In *Wm. S. Pitcairn Corp.* v. *United States,* 39 CCPA 15, C.A.D. 458 (1951), after construing the term "works of art" as used in paragraph 1547(a), the court held that certain ceramic figurines produced from molds made from models which were the work of professional sculptors, and which had genuine beauty, were not created for utility and were intended to be articles of common commerce, were properly classifiable as "copies, replicas, or reproductions" of sculptures under that paragraph.

works of a highly artistic nature and of great aesthetic value, the primary function of the capitals themselves is that generally served by such articles when incorporated in a structure in the manner described herein, namely, to support the floor or roof system above it. The merchandise before us does not consist of two "stone carvings", as plaintiff characterizes them in its brief, but of two "carved stone capitals", as the witness Carey so describes them on Customs Form 3321, a document signed by him and filed with the entry papers herein in connection with the claim for free entry under paragraph 1774.

Accordingly, we need not consider whether the record establishes that the carvings (as distinguished from the capitals) are works of art within the meaning of paragraph 1547(a).

Nor, in view of our findings, need we pass upon whether the term "statuary", as used in paragraph 1774, applies, as defendant claims, "only to sculptures treating figures in the round, as opposed to works in relief" (brief, page 23). The articles before us are fundamentally, as we have already noted, carved capitals rather than carvings, and thus cannot be treated as "statuary" for purposes of paragraph 1774.

Plaintiff has also failed to establish that the merchandise was "imported in good faith for the use of, either by order of, or for presentation (without charge) to, any corporation or association organized and operated for religious purposes". The capitals were ordered (and paid for) by the witness Carey for installation in a church to which he held title and over which he exercised all the rights of ownership, as indicated by the following testimony:

> Q. You say you worked on it, built this yourself, did you, or had it built?—A. Yes. I was the architect, the contractor, foreman, *owner*, the designer.

> Q. Has this been presented at all to the diocese in Vermont?—A. Yes. I have had the approval of the Bishop. He said, "Go ahead and do it." And the church *now* belongs to a small trust which we formed, and *ultimately* it will go to the diocese, I suppose.
> Q. The Diocese of Burlington, Vermont?—A. Yes.

> \* \* \* \* \* \* \*

> Q. What happened to the ownership of the capitals after you had them in your possession?—A. As I said before, the church *now* belongs to a small trust. I made it personally over to this trust, which will carry on the work of the church after my death, and ultimately it is presumed it will be taken over by the diocese.
> Q. Is this an irrevocable trust? Did you make a gift to the trust?—A. Yes. [Emphasis added.]

Thus, the capitals were not imported for presentation to a corporation or association organized and operated for religious purposes.

Furthermore, the nature, purpose and legal status of the "small trust" to which the church "now" belongs were not disclosed.

For the foregoing reasons, the claims under paragraphs 1807(a), 1547(a), and 1774 are overruled; the claim under paragraph 1810 is dismissed. Judgment will be entered accordingly.

(C.D. 4142)